## DON McDONALD v. STATE.

No. A-1813.   Opinion Filed October 4, 1916.

(152 Pac. 610.)

1.   **FORGERY—Indians—Deed to Allotment—Validity.** (a) In order to constitute forgery under the statute in this state, it is not essential that the document alleged to have been forged is capable upon its face of deceiving a third party. It is sufficient if the instrument is or purports to be the act of another, by which any right or interest in real property is or purports to be transferred.

(b.) Deeds conveying lands allotted to members of the Five Civilized Tribes are not void on their face because a recital is contained therein giving the roll number of the allottee, even though such allottee may in fact be a restricted member of the tribe, as that term is ordinarily used in Oklahoma.

2.   **FORGERY—Sufficiency of Evidence—Testimony of Accomplice.** A conviction cannot be based upon the uncorroborated testimony of an accomplice. For testimony sufficiently corroborative under the law of this state to support a conviction, see opinion.

3.   **DOCUMENTARY EVIDENCE—Telegram.** A telegram, the genuineness of which is admitted, is admissible in evidence, although it may not be in the handwriting of the accused. **Dunbar v. United States,** 156 U. S. 185, 15 Sup. Ct. 325, 39 L. Ed. 390.

*Appeal from District Court, Tulsa County;*
*L. M. Poe, Judge.*

Don McDonald was convicted of forgery, and appeals. Affirmed.

*Rittenhouse & Rittenhouse,* for plaintiff in error.

*Chas. West,* Atty. Gen., and *C. J. Davenport,* Asst. Atty. Gen., for the State.

ARMSTRONG, J.   The plaintiff in error, Don McDonald, was tried and convicted at the May, 1912, term of the District Court of Tulsa county, upon a charge of forgery in the first degree, and his punishment fixed at imprisonment in the state penitentiary for a term of seven years. The information in this case is as follows:

"BE IT REMEMBERED:

That Pat Malloy, the duly qualified and acting county attorney for Tulsa county, Oklahoma, who prosecuted in the name and by the authority of the state of Oklahoma, comes now into the District Court for Tulsa county, state of Oklahoma, on this the 7th day of March, A. D. 1912, and gives the court to understand and be informed that M. F. Wheatley, Don McDonald, W. Pyeatt, and George Crawford, on the 11th day of November, 1911, in Tulsa county, state of Oklahoma, and within the jurisdiction of this court, did unlawfully, wilfully, and feloniously, and with the intent to defraud one George N. Sanger, and while acting together and in concert with each other, forge one certain warranty deed purporting to be the act of George N. Sanger, by which forged deed rights and interest in real property was then and there and thereby purported to be transferred and conveyed to the said M. F. Wheatley, in the real property described in said forged deed. Said forged deed being in words and figures as follows, to-wit:

### GENERAL WARRANTY DEED.

This Indenture, Made this 11th day of November, A. D. 1911, between George N. Sanger, a Creek Citizen, Roll No. 2546, a single man of lawful age, Tulsa County, in the State of Oklahoma, of the first part, and M. F. Wheatley of Creek County, Oklahoma, of the second part.

WITNESSETH, The said party of the first part in consideration of the sum of Two Thousand ($2000.00) and No/100 DOLLARS, the receipt of which is hereby acknowledged, does by these presents grant, bargain, sell and convey unto said party of the second part, his heirs and assigns, all of the following described real estate situated in the county of Tulsa, state of Oklahoma, to-wit: The Southeast quarter (SE ¼) of Section twenty-one (21) township Seventeen (17) north of range thirteen (13) of the Indian base and meridian, containing One Hundred and Sixty (160) acres, according to U. S. Government survey thereof.

To HAVE AND TO HOLD the same, together with all and singular the tenements, hereditaments and appurtenances thereunto belonging or in any wise appertaining forever.

And said George N. Sanger for himself and for his heirs, executors or administrators, do hereby covenant, promise and agree to and with said party of the second part at the delivery of these presents he is lawfully seized in his own right of an absolute

and indefeasible estate of inheritance in fee simple in and to all and singular the above granted and described premises, with the appurtenances; that the same are free, clear, and discharged and unincumbered of and from all former grants, titles, charges, estates, judgments, taxes, assessments and incumbrances, of what nature and kind soever_____and that_____he will warrant and forever defend the same unto said party of the second part, his heirs and assigns, against said party of the first part his their heirs and assigns, and all and every person whomsoever, lawfully claiming or to claim the same.

IN WITNESS WHEREOF, the said party of the first part has hereunto set his hand the day and year above written.

                        Sign here   GEORGE N. SANGER
W. Pyeatt

STATE OF OKLAHOMA, TULSA COUNTY, ss.

Before me, W. M. Fleetwood, a Notary Public in and for said county and state, on this 11th day of November, 1911, personally appeared George N. Sanger a single man to me known to be the identical person who executed the within and foregoing instrument, and acknowledged to me that he executed the same as his free and voluntary act and deed for the uses and purposes therein set forth.

                        W. M. FLEETWOOD,
    (Seal)                        Notary Public.
My commission expires Mar 4, 1914

State of Oklahoma, Tulsa County, ss.

This instrument was filed for record on the 15 day of November A. D. 1911 at 1:40 o'clock p. m.
    (Seal)                    H. C. WALKLEY,
    109-388                 .  ·  Register of Deeds.

Contrary to the form of the Statutes in such cases made and provided, and against the peace and dignity of the State."

A demurrer was interposed to this information upon the ground that it failed to state facts sufficient to charge a public offense. The statute upon which the conviction is based, and which was in force at the time the prosecution was instituted, is Section 2560, Snyder's Compiled Laws, and is as follows:

"Every person who, with intent to defraud, forges, counterfeits or falsely alters: 1st, Any will or codicil of real or personal property, or any deed or other instrument being or purporting to be the act of another, by which any right or interest in real property is, or purports to be, transferred, conveyed or in any way changed or affected; or, 2nd, Any certificate or indorsement of the acknowledgment by any person of any deed or other instrument which by law may be recorded or given in evidence, made or purporting to have been made by any officer duly authorized to make such certificate or indorsement; or, 3rd, Any certificate of the proof of any deed, will, codicil or other instrument which by law may be recorded or given in evidence, made or purporting to have been made by any court or officer duly authorized to make such certificate, is guilty of forgery in the first degree."

Counsel's first assignment of error, and the one most strongly relied upon in the brief as well as in the oral argument is based upon the contention that the information does not state a public offense on account of the fact that the deed set out as part of the said information recites the following language: "George N. Sanger, a Creek Citizen, Roll No. 2546, a single man;" it being their contention that this recital renders said deed void, and the information insufficient, without additional averments in the information showing Sanger to be capable of conveying the land free from Federal restrictions. In other words, counsel contend that because there is a conveyance of allotted lands, by an allottee, this court should declare the law to be that all such conveyances are presumed to be void and no person can commit crime by forging deeds to lands of such person if in fact they belong to the restricted class. We cannot agree to any such doctrine. Deeds which recite that the grantor is an Indian allottee of any well known tribe or otherwise are not void on their face, and such has never been the law. In addition, the statute upon which this prosecution is based does not require that the document must be such that upon its face it is capable of deceiving a third party. This statute says that "Every person who, with intent to defraud, forges, counterfeits or falsely alters," etc. . . . "any deed or other instrument being or *purporting* to be the act of another, by which any right or interest in real property *is,* or *purports* to be.

transferred, conveyed," etc. . . . "is guilty of forgery in the first degree."

It is the duty of the courts of this state, when such can be done without violating any of the established rules or canons of construction, to so construe the laws of the land that the rights of the law abiding public shall be protected. This statute fairly and reasonably construed would penalize any person falsely altering or forging a deed in the name of another, and clearly is broad enough to cover the transaction at bar. Counsel have extensively briefed and argued the propositions and various phases of the laws of the United States concerning the removal of restrictions upon certain classes of allottees of lands in the Five Civilized Tribes, and have cited and discussed a large line of authorities which tend to support the doctrine that a deed or document void upon its face cannot be the subject of forgery. Neither of these propositions is involved in this prosecution. In *Roode* v. *The State,* 5 Neb. 174, 25 Am. Rep. 475, the Supreme Court of Nebraska is quoted as supporting the doctrine contended for by counsel. In that case, the court held that the document in question was void upon its face, and was not considering any question based upon the conditions presented here. That court, in discussion of the question before it, among other things—quoting from another authority—uses the following language: "It (meaning the law) was made to protect men in the enjoyment of their property, and if the instrument can by no possibility prejudice anyone in relation to his estate, it will not be an offense within the statute." That is not the question here. The record clearly shows that Sanger was prejudiced by this forgery. So it is with a long line of authorities urged and considered by counsel. None of them supports the proposition that this deed was upon its face void. We have already said it was not void. To hold that the deed was void on its face would be in effect to say that every conveyance of land heretofore made, and most conveyances which are hereafter made, are void upon their face, and therefore presumed to be fraudulent. Such contention is without merit wholly. It is a matter of common knowledge that one-half of the area

embraced in the state of Oklahoma, and probably more, is comprised of what was once and still is in a great measure Indian allotments and reservations. This court cannot say that a deed containing a recital that the grantor was an Indian allottee, is upon its face void and that facts aliunde must be pleaded to overcome the presumption. All deeds to lands in this country are presumed to be valid.

The only other error argued in the brief or presented in the oral argument which it is necessary to consider is based upon the proposition that the conviction stands upon the uncorroborated testimony of the accomplice Wheatley. We are of opinion that this assignment is also untenable. The accomplice, Wheatley, testified minutely and in great detail to all the facts and circumstances leading up to the forgery of the deed. A Mrs. Raspberry, it seems, was the instigator of this criminal conspiracy. She first enlisted the co-operation of one Wheatley and one McKellop, assuring them that it would require only $250.00 to secure a man to forge the name of Sanger and another man to witness the signature. Wheatley furnished money to her for the purpose of securing a man in Missouri to come down and sign the deed. As an encouragement and perhaps to relieve them of any fear of Sanger, she told them that Sanger was a fugitive from justice and lived in California and could not return to Oklahoma, because of having killed his brother here. McKellop and Wheatley went to see the land, and after a few days returned to Tulsa, and were met at the depot by Mrs. Raspberry and the defendant, McDonald. The following day, Mrs. Raspberry, McDonald, McKellop and Wheatley went to the Harris rooms for the purpose of signing the deed, but Wheatley did not like the appearance of the man before whom the deed was to be signed and acknowledged, and refused to go further. The next day, Wheatley and McKellop again met Mrs. Raspberry and the defendant. Mrs. Raspberry told them the man from Missouri had not come, but she had a man in town who would sign the deed and another who would witness the deed. She said it would cost $75.00 to get the deed signed and witnessed. Wheatley gave

her $75.00, and then returned to his home again. The following day they came to Tulsa again, and were met at the depot by Mrs. Raspberry and McDonald. The four went up town; McDonald left them for a few minutes and returned again, having with him W. C. Pyeatt and George Crawford, and stated that these men would sign the deed. Pyeatt said he knew a notary before whom the acknowledgment could be taken. McDonald, Wheatley, Pyeatt and Crawford then walked up to the Turner building, and on reaching the stairway, McDonald asked one of them if the notary was upstairs and received an affirmative reply. McDonald then said to his co-conspirators: "I will wait at the foot of the stairs; they know me up there and I will not go up." Wheatley, Crawford and Pyeatt went upstairs; someone showed them where the office of Fleetwood, the notary, was. They went in. Wheatley handed him the deed, Fleetwood filled out the acknowledgment, put his seal thereon, and said to Crawford: "Do you know what you are doing?" Crawford replied that he did. Fleetwood said: "You are selling a piece of land." Crawford said he understood it. Fleetwood then turned to Pyeatt and said "Pyeatt, you know this man?" Pyeatt said he did; Fleetwood then asked Pyeatt to witness the deed. He did so. They then came out and found defendant waiting in the stairway, half way up. From here they went to the Fountain Drug store where Mrs. Raspberry was waiting. Wheatley started to the depot, accompanied by McDonald. While waiting at the depot, Mrs. Raspberry, Pyeatt and Crawford came in. Mrs. Raspberry said she had left her purse at home, and requested Wheatley to pay Crawford and Pyeatt for signing and witnessing the deed. Wheatley gave Crawford a check for $15.00 and gave Pyeatt a check for $5.00. He also gave Crawford $2.00 in silver and $5.00 in currency. Wheatley, during the early negotiations, gave McDonald a check for $10.00. He wanted some money and Wheatley gave it to him with the understanding that it would be repaid out of his part of the proceeds from the sale of the land covered by the deed in question. It was agreed between all the parties that the money advanced by Wheatley should be paid

first, and that the balance should be equally divided between McKellop, Wheatley, McDonald and Mrs. Raspberry. The testimony of Wheatley is so minutely definite that it carries with it every element of truthful and convincing narrative. The record abounds with circumstances which tend conclusively to establish that everything he says is true.

The rule by which to determine the sufficiency of corroborating evidence is stated in the syllabi of the opinion in *Alderman* v. *Territory,* 1 Okla. Cr. 562, 98 Pac. 1026, to be:

"1. To test the legality of a verdict in a case of larceny, where the jury has convicted a defendant upon the testimony of an accomplice, with independent evidence tending to connect the defendant with the commission of the offense, this court will take the strongest view of the corroborating evidence against the defendant that the evidence would warrant the jury in arriving at.

"2. Where a defendant is convicted on accomplice testimony, and the evidence is clear and direct, this court will not reverse the judgment of the lower court, unless it is able to say that the record does not contain any evidence, independent of the testimony of the accomplice, which tends to connect the defendant with the commission of the offense."

In *People* v. *Martin* (Cal. App. 295) 125 Pac. 219, the Supreme Court states the doctrine as follows:

"The statute does not require that the evidence necessary to corroborate the testimony of an accomplice shall tend to establish the precise facts testified to by the accomplice; and strong corroborative evidence is not necessary to support a judgment of conviction founded upon the testimony of an accomplice. Even though the circumstances constituting the evidence offered and received in corroboration of the testimony of an accomplice be slight, such evidence is nevertheless sufficient to meet the requirements of the law, if, in and of itself, it tends to connect the accused with the commission of the offense. *People* v. *Barker,* 114 Cal. 620, 46 Pac. 601; *People* v. *Cleveland,* 49 Cal. 577; *People* v. *Clough,* 73 Cal. 348, 15 Pac. 5."

The record is replete with circumstances tending to show McDonald's guilty connection with the forgery, outside of the

accomplice's testimony. Wheatley's testimony is corroborated by William Lynch in all he said with reference to meeting a man who showed them Fleetwood's office and as to defendant's remaining on the outside. Lynch says that on November 11th his office was in the Turner building; that Fleetwood's office was in the same building; that he knows the defendant, and that he saw him on the 11th of November. He further testified:

"Q. Tell the jury how you saw him and where you saw him; the circumstances attending it? A. Well, there were some gentlemen come to the office and wanted to know if I was a notary, and I told them I was not, and there was a notary on the floor. I taken them around to his room. I taken them around to his room and as I came back out I seen Don McDonald out in the hall there.

"Q. To Fleetwood's room? A. Yes, sir, I taken them around to Fleetwood's room."

Further he testified:

"Q. Where did you see Don McDonald? A. Well, he was in the hallway, between Fleetwood's office and my office.

"Q. Did you walk by him? A. Yes, sir, I walked by him.

"Q. With these other people? A. I didn't see him as I went in with them.

"Q. You saw him after you came back? A. Yes, sir.

"Q. What was he doing, if anything? A. Just standing there."

Lynch was in no way interested in this transaction, and was not an accomplice. His testimony entirely corroborates that of the accomplice Wheatley and shows that McDonald was in the building, and that he was waiting on the outside of Fleetwood's door for the return of Wheatley, Crawford and Pyeatt. The deed was forged in Fleetwood's office. McDonald's presence there at that time can be accounted for upon no other theory than that he was implicated in the conspiracy formerly entered into by which the deed to this Indian's land was to be forged and was forged. It shows that the plans formerly made were then being carried into effect. In *Alderman* v. *Territory, supra,* where

the corroborating evidence of the accomplice in a larceny case was the presence of the defendant near the place where the larceny was committed, this court said:

"While this evidence does not directly connect the defendant with the offense, yet this court cannot say that it does not have this tendency, and in view of the clear and direct testimony of the accomplices we feel that the jury was authorized to convict the defendant."

The accused, if it were true that he, as he stated, was not in the Turner building at that time, might well have furnished evidence as to his whereabouts elsewhere, but he chose simply to deny his presence there.

Wheatley also testified that he gave a check for $10.00 to the defendant on account of the Sanger land transaction, and that it was an advancement on that deal, and Wheatley was to be paid this amount out of the defendant's portion of the proceeds from the sale of the land. The check was made to A. J. Dabis at McDonald's request, he stating that he could cash it better if it were made out in some other name. The check appears on page 53 of the record. He did receive this check. Although he denies this fact, George T. Brown testified that he received it from him; that McDonald handed the check to him, Brown, with $15.00 in money to pay on a collection against Betty Raspberry. That he, McDonald, had been to see Brown several times with reference to the collection against Betty Raspberry.

The evidence of Partridge with reference to the execution of the oil and gas lease by Wheatley to him and the facts in connection therewith, are strong circumstances connecting the defendant with the forgery of the deed. Partridge says that he had looked up the record with reference to this land, and had found it was in the name of Welch, and was talking to Welch about it. McDonald was in his office, and stated that the man from whom they were to secure the lease was down on the street, and that he would go and get him. He went down and saw Wheatley, who went to Sapulpa. McDonald put in a call

for him and had him come back and they met at Partridge's office that night when the oil lease was executed. No satisfactory explanation is made as to how he became possessed of such intimate knowledge with reference to the transaction. In Partridge's office he was very anxious to have the trade carried through. This shows that he had more than a friendly interest in the matter. It appears throughout the evidence that he was continually calling Wheatley over the telephone and Wheatley says it was with reference to what disposition should be made of the Sanger land. His explanation of various telephone conversations is that they were with reference to the Hilly Bear case, but it does not appear wherein either Wheatley or the defendant were financially or otherwise interested in that matter. Wheatley testifies that before he left Oklahoma to go to Tennessee he told the accused that he would wire the latter as to his address so that he could keep him posted with reference to the Sanger land. The accused in his testimony admitted the receipt by him of a telegram from Wheatley, and the fact that he had sent one to Wheatley saying that everything was clear. He testified:

"Q. Do you know how many telegrams you sent him while he was in Tennessee? How many telegrams did you receive from him? A. Just one.

"Q. And you answered one? A. Yes, sir.

"Q. And told him everything was clear? A. Yes, sir.

"Q. And that that meant that the Hilly Bear case would come up at the time it was set? A. That they were not going to try the Hilly Bear case as they expected, is what it meant."

It thus appears that only one telegram was sent by the defendant to Wheatley while he was in Tennessee, and he says he answered it. In his testimony he gives the substance of the telegram.

Counsel in the brief argue that this evidence is incompetent, but their position is not tenable. The accused admitted the sending and receiving of the telegrams, but testified that they were not in reference to the Sanger land deal. In *Dunbar* v. *United*

*States,* 156 U. S. 185, at page 196, 15 Sup. Ct. 325, at page 329 (39 L. Ed. 390), speaking with reference to a similar objection, the court said:

"Again, error is alleged in respect to the admission in evidence of a certain telegram. The facts in respect to this matter are as follows: The witness Blum was stating that defendant telegraphed certain things to him. An objection being raised, he produced a typewritten telegram, and said that he received it from the defendant. It was further objected that it was not the original—the one prepared and signed by the defendant; whereupon the witness testified that it was delivered to him by the telegraph company, and that he afterwards talked to the defendant about it, who confirmed it and admitted that he had sent it. Thereupon the court permitted the telegram to be read in evidence. In this there was no error. Whatever may be the rule in other cases, an admission by defendant that the writing which is offered is the message which he sent, is sufficient to justify its introduction in evidence. An admission as to a writing is like an admission of any other fact, and when a competent witness testifies that a certain writing, which he produces, was received by him, and that the defendant admitted that he sent it to him, he has laid the foundation for the introduction of the writing, and this though it be not in the handwriting of the defendant."

The telegram from Wheatley to the accused reads as follows: "Am in Knoxville tonight. Closed a small deal yesterday. Start home tomorrow. Keep this to yourself. Wire me at Nashville, Tenn., tomorrow how things are going." And the accused answered: "Things are clear here. Wire me what day arrive home." Accused says that these telegrams had reference to when the Hilly Bear case would be set, but there is nothing in the telegrams which could possibly have any connection with the Hilly Bear case. It would hardly be probable that if McDonald were wiring to Wheatley as to when a case would be set that he would say "Things are clear here." More likely he would say that the case had been set for a certain time. These telegrams are strong evidence corroborating the witness Wheatley as to McDonald's connection with the forgery of the deed.

There are many other circumstances and facts in this record which show the guilt of the accused beyond any doubt. The court expressly instructed the jury that they could not convict

McDonald on the testimony of Wheatley unless Wheatley was corroborated by other evidence which in itself and without the aid of the testimony of the accomplice connected the defendant with the commission of the offense. When a case is thus properly submitted to a jury upon evidence so strong and convincing as that of Wheatley, and where other facts and circumstances in the case tend conclusively to connect the accused with the commission of the crime, the sufficiency of that evidence is ordinarily to be left to the determination of the jury.

In *Jinks McGill* v. *State,* 6 Okla. Cr., 512, this court said that if there is evidence which corroborates the accomplice and tends to connect the defendant with the commission of the crime, its sufficiency is for the determination of the jury, and in a case where the defendant is convicted on accomplice testimony and the accomplice's testimony is clear and direct, this court will not reverse the judgment of the lower court, unless it is able to see that the record does not contain *any evidence* in corroboration of the testimony of the accomplice which tends to connect the defendant with the commission of the crime.

The testimony in this case overwhelmingly points to the guilt of the defendant, and nothing short of fundamental error would justify a reversal of the judgment. No such error is presented. The judgment is affirmed.

DOYLE, P. J., concurs; FURMAN, J., absent.